# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NEW ENGLAND CONFECTIONERY | ) | |
| COMPANY, INC., | ) | |
| | ) | Case No. 18-11217-MSH |
| Debtor. | ) | |
| | ) | |

### ORDER APPROVING AND AUTHORIZING SALE OF CERTAIN OF ESTATE'S ASSETS FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AND GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[1] of New England Confectionery Company, Inc. (the "Debtor"), for entry of an *Order Approving Private Sale Of Certain Of Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests And Granting Related Relief;* and the *Chapter 11 Trustee's Motion (A) to Approve Bidding Procedures, Notice Procedures, and Breakup Fee in Connection with Motion for Order Approving Private Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) to Authorize Trustee to Effectuate sale Pursuant to Terms of Asset Purchase Agreement, as Amended, and (C) for Related Relief* (the "Sales Procedure Motion" and collectively, the "Motions"); and objections to the Sale Motion having been filed by the United States Environmental Protection Agency and the Pension Benefit Guaranty Corporation; and this Court having considered any objections filed to the Motions; and this Court having determined that the relief requested in the Motions is in the best interests of the Debtor's estate (the "Estate"), its creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; adequate notice having been given and a hearing having been held on May 23, 2018 (the "Hearing") which

---

[1] Capitalized terms used but not defined herein have the meanings given in the Purchase Agreement (as defined below).

included an auction amongst qualifying bidders (the "Auction"); the Court having considered the

testimony, documentary evidence, offers of proof (to the extent consented to by the parties),

stipulations of the parties, and the arguments of counsel; good cause otherwise having been

shown for the relief requested;

NOW, upon the Motions, the exhibits annexed thereto, the evidence presented at the

Hearing and the arguments of counsel advanced at the Hearing, and all prior pleadings and

proceedings made herein,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    This Court, pursuant to 28 U.S.C. § 1334, has jurisdiction over all assets of the

Estate. The Sale Motion is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (M), (N)

and (O). Venue of the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

B.    The statutory predicates for the relief sought in the Sale Motion are sections

105(a), 363 and 365 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014..

. C.    The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052,

made applicable to this proceeding pursuant to FRBP 9014. To the extent that any of the

following findings of fact constitute conclusions of law, they are adopted as such. To the extent

that any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.    This Order constitutes a final and appealable order within the meaning of 28

U.S.C. §158(a). Notwithstanding FRBP 6004(h) and 6006(d), the Court expressly finds that

there is no just reason for delay in the implementation of this Order and expressly directs entry of

judgment as set forth herein.

E.      On April 3, 2018 (the "<u>Involuntary Date</u>") an involuntary petition was filed pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts.

F.      On April 17, 2018, the Debtor filed a motion to convert its case to a case under Chapter 11 of the Bankruptcy Code (the "<u>Motion to Convert</u>") as well as the Sale Motion, pursuant to which the Debtor sought authority to sell substantially all of its assets to CI-N Acquisition, LLC ("<u>CI-N</u>") pursuant to the terms of an asset purchase agreement and a transition services agreement of even date.

G.      On April 19, 2018, the Court granted the Motion to Convert and entered an order for relief effective April 17, 2018.

H.      Upon oral motion of the United States Trustee, the Court ordered the appointment of a trustee.  On April 20, 2018, Harold B. Murphy was appointed Chapter 11 trustee (the "<u>Chapter 11 Trustee</u>") of the Estate and continues to serve in that capacity.

I.      Since his appointment, the Chapter 11 Trustee and CI-N agreed to certain modifications to the asset purchase agreement and transition services agreement, as reflected by a First Amendment to Asset Purchase Agreement and Transition Services Agreement dated April 30, 2018.  The Chapter 11 Trustee and the CI-N also agreed to an extension of the sale process and an opportunity for the submission of counteroffers, which were not provided for in the Sale Motion.

J.      On or about May 2, 2018, the Chapter 11 Trustee filed the Sales Procedure Motion which was approved by order dated May 2, 2018 (the "<u>Sales Procedure Order</u>").

K.      On May 3, 2018, the Court entered the *Final Order (I) Authorizing Chapter 11 Trustee to Obtain Postpetition Secured Financing; (II) Authorizing Chapter 11 Trustee to Use*

3

*Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Lender; and (IV) Modifying the Automatic Stay* (the "Financing Order"), representing an agreed order between the Chapter 11 Trustee and ACAS, LLC (formerly known as American Capital, Ltd., successor by merger with American Capital Financial Services, Inc.) (the "Lender") for the use of cash collateral and postpetition financing.

L.      As evidenced by the certifications of service previously filed with the Court, and based on the representations of counsel at the Hearing: (i) proper, timely, adequate, and sufficient notice of the Sale Motion, Sales Procedure Motion and the Hearing has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Fed. R. Bankr. P. 2002, 6004, 6006, 9007, and 9014; (ii) such notice was good and sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion, Sales Procedure Motion and the Hearing or the entry of this Order shall be required.

M.      A reasonable opportunity to object or be heard with respect to the Sale Motion, the Hearing, and the Order, and the relief requested therein has been afforded to all interested parties and entities. Notice of the Hearing was adequate and proper under the circumstances.

N.      Bids for NECCO's product lines ("Product Line Bids") were submitted by: (i) Frankford Candy, LLC; (ii) Stichler Products, Inc.; and (iii) Melville Candy Corporation. Bids for the entirety of the Purchased Assets, as defined in the Purchase Agreement, were submitted by: (i) kgbdeals Shopping, Inc.; (ii) Spangler Candy Company; and (iii) Round Hill Investments, LLC.

O.      The Product Line Bids did not satisfy the minimum bid requirement set forth in the Sales Procedure Order and therefore did not participate in the Auction. An Auction was held at the Hearing respecting the remaining bids. The highest and best offer was submitted by

4

Spangler Candy Company ("Spangler") for a purchase price of $18,830,000 to be paid by

Spangler to the Chapter 11 Trustee as follows: (i) $17,830,000 at the time of the closing of the

sale, $250,000 on or before June 30, 2018, $250,000 on or before July 31, 2018, $250,000 on or

before August 31, 2018, and $250,000 on or before September 30, 2018 and for other

consideration.  Spangler did not timely close the sale.  The second highest and best offer was

submitted by Round Hill Investments LLC (the "Buyer") for a purchase price of $17,330,000 to

be paid by the Buyer to the Chapter 11 Trustee as follows: (i) $16,330,000 at the time of the

closing of the sale, which is to be one (1) business day after entry of this order (the "Closing")[2]

$250,000 on or before June 30, 2018, $250,000 on or before July 31, 2018, $250,000 on or

before August 31, 2018, and $250,000 on or before September 30, 2018 and for other

consideration pursuant to the terms and conditions set forth in the Sale Motion and the amended

asset purchase agreement ("Asset Purchase Agreement"), amended transition services agreement

("Transition Services Agreement"), and ancillary documents (each as may be amended or

supplemented from time to time and as may be attached hereto as Exhibit A, collectively, the

"Purchase Agreement").

     P.     The Purchase Agreement was offered in good faith, from arm's-length bargaining

positions without collusion or fraud, by the Buyer. The Chapter 11 Trustee has demonstrated

good, sufficient, and sound business purpose and justification and compelling circumstances for

the approval of the Purchase Agreement contemplated by the Sale Motion free and clear of all

Encumbrances (as defined herein) pursuant to Sections 105, 363(b), (f), and (m) of the

Bankruptcy Code.

---

[2] The deposit paid by Buyer to the Chapter 11 Trustee shall be applied to the portion of the purchase price due to the Chapter 11 Trustee at the Closing.

5

Q.     The procedures under the Sale Procedure Order provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets, and the Purchased Assets were adequately marketed. The Trustee has complied with the Sale Procedure Order. The Buyer complied with the Sale Procedure Order in all respects.

R.     The Purchase Agreement and the closing thereon will provide a greater recovery for the Estate than would be provided by any other presently available alternative. The consideration to be paid by the Buyer under the Purchase Agreement constitutes reasonably equivalent value and fair consideration for the Purchased Assets.

S.     The Buyer has acted in good faith in this matter, and is a good faith purchaser as that term is used in the Bankruptcy Code, and is, accordingly, entitled to the protections set forth in section 363(m) of the Bankruptcy Code.

T.     The Purchased Assets constitute property of the Estate pursuant to Section 541(a) of the Bankruptcy Code.

U.     A valid business purpose exists for approval of the Purchase Agreement and transaction contemplated by the Sale Motion pursuant to sections 105 and 363(b), (f), and (m) of the Bankruptcy Code. The Estate may sell, transfer and assign the Purchased Assets, as defined in the Purchase Agreement, free and clear of Encumbrances (as defined below) in accordance with sections 105 and 363 of the Bankruptcy Code. As a condition to purchasing the Purchased Assets, the Buyer requires that: (a) the Purchased Assets be sold free and clear of Encumbrances; and (b) the Buyer shall have no liability whatsoever for any obligations of or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against the Debtor except those arising under the Purchase Agreement. The Buyer would not enter into the Purchase Agreement and consummate the transactions contemplated by the Purchase Agreement, thus

6

adversely affecting the Debtor's estate, if the sale to the Buyer was not free and clear of Encumbrances or if the Buyer was or would be liable for any obligations of or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against the Debtor.

V.   With respect to any and all persons or entities asserting any and all liens (including mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, any liabilities or obligations under any State or Federal WARN Act or similar law,  any liabilities or obligations under COBRA, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, recoupment, rights of recovery, judgments, orders and decrees of any Court or foreign or domestic governmental authority, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, products liability, alter-ego liability, environmental liability, employee-related claims, employee pension or benefit plan claims (including, without limitation, the "Retirement Plan" as defined in the *Declaration of Michael McGee in Support of First Day Motions* [Docket No. 26] (the **"First Day Declaration"**), the "IAM Pension Plan" or the "Frozen Pension Plan," each as defined in the First Day Declaration, and the "Pension Plan" as defined in the *Limited Objection of the Pension Benefit Guaranty Corporation to the Amended Notice of Intent to Sell Assets by Private Sale Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. 176]), multiemployer benefit plan claims, liabilities related to unpaid contributions or current or potential withdrawal liability, liabilities under collective bargaining agreements, retiree healthcare or life insurance claims, successor liability, tax and other liabilities, rights, causes of

7

action and claims of any kind or nature whatsoever, to the fullest extent of the law, in each case whether at law or in equity, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Involuntary Date, whether imposed by agreement, understanding, law, equity or otherwise (each, an "Encumbrance"), on the Purchased Assets, (i) applicable non-bankruptcy law permits sale of such property free and clear of such Encumbrance; (ii) such person or entity has consented to the sale, free and clear of its Encumbrance, with such Encumbrance to attach to the proceeds of such sale; (iii) such Encumbrance is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such Encumbrance is in bona fide dispute; or (v) such person or entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such Encumbrance; so that the conditions of section 363(f) of the Bankruptcy Code have been satisfied. Those holders of Encumbrances who did not object or who withdrew their objections to the Sale Motion are deemed to have consented to the Sale Motion pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the subsections of section 363(f) of the Bankruptcy Code and has been satisfied as to all such Encumbrances.

W.     The Buyer shall have no obligations with respect to any liabilities of the Debtor or the Estate, including, without limitation, the liabilities of the Debtor or the Estate specifically excluded under the Purchase Agreement, and the Trustee, on behalf of the Debtor and the Estate, hereby releases and forever discharges the Buyer and its successors and assigns from any and all

claims, causes of action, obligations, liabilities, demands, damages, losses, costs and expenses of
any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the
sale and assignment of the Purchased Assets.

X.    Notwithstanding anything contained herein:

(i)    Other than with respect to the Buyer and/or its properties, assets, officers,
directors, or employees (together with Buyer, the "Buyer Entities"), nothing in this Order
or the Purchase Agreement shall in any way be construed to (a) discharge, release, limit,
or relieve any party other than the Buyer Entities for controlled group liability or
fiduciary breach related to the Sixth Amended and Restated NECCO Pension Plan (the
"Pension Plan"), or (b) enjoin or preclude the Pension Benefit Guaranty Corporation or
the Pension Plan from enforcing such liability or responsibility (other than with respect to
the Buyer Entities; and

(ii)    Nothing in this Order or the Purchase Agreement releases, nullifies,
precludes or enjoins the enforcement of any police or regulatory liability to a
governmental unit that any entity would be subject to as the post-sale owner or operator
of property after the date of entry of this Order including, without limitation, the
obligation under 40 C.F.R. Party 68 to update the Risk Management Plan and other
components of the chemical accident prevention program for the manufacturing facility
located at 135 American Legion Highway, Revere, Massachusetts. Nothing in this Order
or the Sales Agreements authorizes the transfer or assignment of any governmental (a)
license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the
discontinuation of any obligation thereunder, without compliance with all applicable
legal requirements and approvals under police or regulatory law.

Y.    As more fully set forth in the Financing Order, the Lender asserts claims
exceeding $107,000,000 against the Estate as of the Involuntary Date secured by all assets of the
Estate, including the Purchased Assets.  The Lender has consented to the Sale Motion.

Z.    Under all the circumstances presented, (i) all actions contemplated in the Purchase
Agreement; (ii) consummation of all acts contemplated in this Order; (iii) the transfer of the
Purchased Assets by the Estate to Buyer; and (iv) the receipt by the Estate of the purchase price
are, in each case, in the best interests of the Estate, creditors, and interest holders.

AA.    The Chapter 11 Trustee has articulated sound business reasons for performing the
Purchase Agreement and selling the Purchased Assets as set forth in the Sale Motion and the

9

Sales Procedure Motion outside of a plan of reorganization as soon as is practicable. It is a reasonable exercise of the Chapter 11 Trustee's business judgment to execute, deliver and consummate the Purchase Agreement with the Buyer and consummate the transactions contemplated by the Purchase Agreement. The sale and assignment of the Purchased Assets outside of a chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan for the Debtor. The Sale does not constitute a *sub rosa* chapter 11 plan.

BB.   The transfer of the Purchased Assets to the Buyer is or will be a legal, valid and effective transfer of the Purchased Assets, and will vest in the Buyer all right, title and interest of the Estate in and to the Purchased Assets, free and clear of Encumbrances.

CC.   An injunction against creditors and third parties pursuing Encumbrances is necessary to induce the Buyer to close under the Purchase Agreement; the issuance of such an injunction is therefore necessary to avoid irreparable injury to the Debtor's estate, and will benefit all creditors.

DD.   The Closing and the consummation of the transactions contemplated by the Purchase Agreement shall not subject Buyer to any liability whatsoever with respect to the Debtor's operations, whether prepetition or postpetition, except for those obligations provided for under the Purchase Agreement. Upon Closing, the Buyer shall not be deemed to have assumed any liabilities of the Debtor. The Buyer's acquisition of the Purchased Assets shall be free and clear of all Encumbrances, including, without limitation, any "successor liability" claims.

EE.   In the absence of a stay pending appeal, cause has been shown as to why this Order should not be subject to the stay provided by FRBP 6004(h) and 6006(d).

10

FF.    Neither the Estate nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or avoidable, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, and the Buyer is entitled to all the protections and immunities of section 363(n) of the Bankruptcy Code. The Buyer is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code).

GG.    The Purchase Agreement was not entered into, and none of the Trustee, on behalf of the Debtor and the Estate, the Buyer or the Buyer's present or contemplated owners, have entered into the Purchase Agreement or propose to consummate the Sale Transaction, for the purpose of hindering, delaying or defrauding the Debtor's present or future creditors. None of the Trustee, on behalf of the Debtor and the Estate, the Buyer nor the Buyer's present or contemplated owners is entering into the Purchase Agreement, or proposing to consummate the Sale, fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

HH.    Time is of the essence in consummating the Sale. The Court finds that there is cause to waive and/or vacate the stay imposed by Rule 6004(h) of the Bankruptcy Rules, and such stay is hereby vacated and shall have no application to the relief afforded by this Order.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Sale Motion is granted as set forth herein, and the Sale is approved as set forth herein.

2.    The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to FRBP 7052, made

11

applicable to this proceeding pursuant to FRBP 9014. To the extent any finding of fact later shall

be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion

of law later shall be determined to be a finding of fact, it shall be so deemed.

     3.      The Chapter 11 Trustee is authorized to transfer the Estate's right, title, and

interest in the Purchased Assets to the Buyer in accordance with the Sale Motion and the

Purchase Agreement. All objections with regard to the relief sought in the Sale Motion that have

not been withdrawn, waived, or settled or resolved by the terms of the Order are hereby

overruled on the merits. The Purchase Agreement, an executed copy of which was filed with the

Court, is approved in all respects.   The Chapter 11 Trustee and his agents are hereby authorized

and empowered and, upon entry of this Order, have all the power and authority necessary to:

          a.      Fully perform under, consummate, implement, execute, and deliver the

                 Purchase Agreement together with all additional instruments that may be

                 necessary or desirable to implement the Purchase Agreement, and to take

                 all other actions required to be taken pursuant to the Purchase Agreement;

          b.      Receive the consideration described in the Purchase Agreement from

                 Buyer, subject to Encumbrances as further specified herein;

          c.      Cooperate in the transfer of all licenses and permits to the Buyer, execute

                 and deliver such documentation and certificates as are necessary or

                 required to operate, transfer, or cancel the licenses and permits; and

          d.      Fully perform and take all action necessary to effectuate the Purchase

                 Agreement, and the obligations contemplated by this Order including but

                 not limited to (a) transferring the Estate's right to use the account with

                 Eastern Bank ending in 9227 (the "Account") free and clear of

Encumbrances, (b) assigning the Account to the Buyer, or (c) otherwise directing sweeps, disbursements, or other distributions from the Account to any other account or depository as directed by the Buyer. In this regard, and notwithstanding anything contained in the *Order Authorizing (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Continued Use of Existing Cash Management Systems, and (D) Waiver of Certain Guidelines Relating to Bank Accounts* [docket no. 94], Eastern Bank is authorized to effectuate the foregoing transfer, assignment, or direction.

4.    The assumption and assignment procedures set forth in Section 4.7 of the Asset Purchase Agreement are hereby approved; *provided* that the Option Period shall mean the thirty-day period after the Closing Date.

5.    In conjunction with the sale of the Purchased Assets to the Buyer, the Chapter 11 Trustee is authorized to enter into an extension of that certain Indenture of Lease dated April 24, 2017 by and between NECCO and Atlantic-Revere Realty LLC (the "Landlord") through November 30, 2018 (or such later date as the Trustee, the Landlord, and Buyer may agree) without further order of the Court.

6.    The Chapter 11 Trustee is authorized to facilitate a license agreement by and between the Buyer and the Landlord (the "License Agreement") and, when executed, the transactions contemplated thereby, including without limitation, the grant of the license and the payment of consideration to the Landlord, are hereby approved, and, once effective and consummated, such License Agreement and such transactions, including without limitation the payment of such consideration, are not subject to repayment, revocation, withdrawal, rescission,

13

avoidance, or disgorgement, without regard to any future action of any person or entity or any further order of the Court, including without limitation any rejection of the lease or any approval by the Court of any such rejection.

7.      The Transition Services Agreement and the transactions contemplated thereby, are hereby approved. Seller, on behalf of the Debtor and the Estate, shall remain in compliance with all laws, rules and regulations governing the maintenance and operation of the Facility, including, without limitation, the Federal Food, Drug, and Cosmetic Act and title 21 of the Code of Federal Regulations, and shall perform or cause to be performed any corrective action that may be required thereunder. For the avoidance of doubt, upon termination of the Transition Services Agreement, no liability of the Buyer shall accrue on or after the effective date of termination.

8.      No other or further consents or approvals of this Court are required for the Estate to consummate or effectuate (i) the Purchase Agreement, (ii) the transfer of the Purchased Assets, and (iii) the receipt of consideration from Buyer.

9.      The Purchased Assets shall be transferred to the Buyer, and upon consummation of the Purchase Agreement, shall transfer all right, title and interest of the Estate in the Purchased Assets. Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Purchase Agreement and/or a bill of sale or assignment transferring indefeasible title and interest in the Purchased Assets to the Buyer free and clear of all Encumbrances.

10.     Pursuant to section 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to Buyer, and, upon the Closing under the Purchase Agreement, the Purchased Assets

shall be free and clear of any and all Encumbrances, which Encumbrances, if any, shall attach to

the proceeds of the sale in the same priority and subject to the same defenses and avoidability as

of the Closing, and all parties shall retain their rights with respect to such Encumbrances without

prejudice. This Order does not determine the extent or validity of any claims against the Estate,

nor does it modify, supersede or otherwise affect the Financing Order.

      11.    All parties and/or entities (including "Governmental Units" as defined in sections

101(27) and 101(41) of the Bankruptcy code) asserting Encumbrances and contract rights against

the Estate and/or any of the Purchased Assets, including, without limitation, all debt security

holders, equity security holders, governmental, tax and regulatory authorities, lenders,

employees, former employees, pension plans, multiemployer pension plans, labor unions, trade

creditors and any other creditors, are hereby forever barred, estopped, permanently enjoined and

precluded from, solely with respect to such Encumbrances: (i) asserting, commencing or

continuing in any manner any claim or action against Buyer or any director, officer, agent,

representative, employee, successor or assign of the Buyer (all such entities are collectively

referred to as the "Protected Parties"), or against any Protected Party's assets or properties,

including without limitation against the Purchased Assets; (ii) the enforcement, attachment,

collection or recovery, by any manner or means, of any judgment, award, decree or order against

the Protected Parties or any properties or assets of the Protected Parties; (iii) creating, perfecting

or enforcing any encumbrance of any kind against the Protected Parties or any properties or

assets of the Protected Parties, including without limitation the Purchased Assets; (iv) asserting

any setoff, right of subrogation or recoupment of any kind against any obligation due the

Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, that does

not conform to or comply with the provisions of this Order or the Purchase Agreement.

12.     The consummation of the Purchase Agreement shall not, except to the extent
specifically provided therein or obligations arising thereunder, subject Buyer or any of its
affiliates to any liability whatsoever with respect to the Debtor's prepetition or the Estate's
postpetition operations in any form or manner whatsoever, including, without limitation, by
reason of any theory of successor or transferee liability, *de facto* merger, or substantial
continuity, any employment or labor agreements including, without limitation, any collective
bargaining agreement or other agreement with the "BCT Union," the "IAM Union," or the
"IUOE Union" (each as defined in the First Day Declaration), or the termination of any of such
employment or labor agreements, any pension, welfare, compensation or other employee benefit
plans, agreements, practices and programs, including, without limitation, any pension plan of or
related to the Debtor or its Affiliates or predecessors or any current or former employees of any
of the foregoing, including, without limitation, the "IAM Pension Plan" or the "Frozen Pension
Plan" (each as defined in the First Day Declaration) and any other agreements related to the IAM
Pension Plan or the Frozen Pension Plan, or the termination of any of the foregoing, any
employee, worker's compensation, occupational disease or unemployment or temporary
disability related law, including, without limitation, claims that might otherwise arise under or
pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended; (b) the Fair
Labor Standards Act; Title VII of the Civil Rights Act of 1964; (d) the Federal Rehabilitation
Act of 1973; (e) the National Labor Relations Act; (f) the Worker Adjustment and Retraining
Notification Act of 1988; (g) the Age Discrimination and Employee Act of 1967 and Age
Discrimination in Employment Act, as amended; (h) the Americans with Disabilities Act of
1990; (i) the Consolidated Omnibus Budget Reconciliation Act of 1985; (j) the Multiemployer
Pension Plan Amendments Act of 1980; (k) state discrimination laws; (l) state unemployment

compensation laws or any other similar state laws; (m) state workers' compensation laws; or (n)
any other state or federal employee benefit laws, regulations or rules or other state or federal
laws, regulations or rules relating to employment with the Debtor or any predecessor of the
Debtor; any antitrust laws, any product liability or similar laws, whether state, federal or
otherwise, any environmental laws, rules, or regulations, including, without limitation, under the
Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601,
*et seq.*, or similar state statutes, any bulk sales or similar laws, any tax statutes or ordinances,
including, without limitation, the Internal Revenue Code of 1986, as amended, or the Debtor's
business operations or the cessation thereof, whether known or unknown and whether asserted or
unasserted as of the closing, and all parties in interest are deemed to release and forever
discharge the Buyer and its affiliates, successors and assigns from any and all Encumbrances,
causes of action, obligations, liabilities, demands, damages, losses, costs and expenses of any
kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale
and assignment of the Purchased Assets.

13.     If any person or entity that has filed a financing statement or other documents or
agreements evidencing or asserting an Encumbrance on the Purchased Assets shall not have
delivered, in proper form for filing, termination statements, instruments of satisfaction, releases,
and other documents to the Estate prior to the closing, then the Buyer shall be and hereby is
authorized upon closing of the Purchase Agreement to execute such termination statements,
instruments of satisfaction, releases, and other documents on behalf of the person or entity and to
file the same with any appropriate registry or public filing office. This Sale Order is deemed to
be in recordable form sufficient to be placed in the filing or recording system of each and every
federal, state or local government agency, department or office. Notwithstanding the foregoing,

the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and notwithstanding the failure of Buyer, the Chapter 11 Trustee, or any other party to execute, file, or obtain releases, termination statements, assignment consents, or other instruments to effectuate, consummate, and/or implement the provisions hereof or the Purchase Agreement with respect to the sale of the Purchased Assets, all Encumbrances on the Purchased Assets shall be and hereby are deemed to be divested, terminated, and discharged. Neither the Trustee, on behalf of the Debtor and the Estate, nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.     This Order shall be binding upon and govern all acts of all entities, persons, governmental units, and all holders of Encumbrances including, without limitation, federal, state, and governmental agencies and departments, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report, insure any title, or state of title in or to any lease, and each of the foregoing entities, is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

15.     To the greatest extent available under applicable law: (i) the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and any other

18

governmental authorization or approval of the Debtor and the Estate with respect to the

Purchased Assets; (ii) all such licenses, permits, registrations, and governmental authorizations

and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as

of the Closing; and (iii) no governmental unit may revoke or suspend any permit or license

relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser

on account of the filing of the involuntary chapter 7 petition, entry of the order for relief,

conversion of the chapter 7 case to a case under chapter 11 or pendency of this chapter 11 case or

the consummation of the Sale contemplated by the Purchase Agreement.

16.    The Chapter 11 Trustee is hereby authorized, empowered, and directed, and, upon

entry of the Order, shall have all the authority necessary, to perform such ministerial acts as may

be required to effectuate and implement the Purchase Agreement.

17.    All of the transactions and actions contemplated by this Order are properly

authorized under section 363 of the Bankruptcy Code.

18.    This Court retains jurisdiction to enforce and implement the terms and provisions

of this Order and the Purchase Agreement, including but not limited to, retaining jurisdiction (a)

to compel delivery of the Purchased Assets to Buyer; (b) to resolve any disputes arising under or

related to the Purchase Agreement; (c) to protect the Buyer, or the Purchased Assets, from and

against any Encumbrances; and (d) to interpret, implement, and enforce the provisions of this

Order. Further, this Court retains jurisdiction over the parties to the Purchase Agreement with

respect to any matters related to or arising under the Purchase Agreement or under this Order.

19.    The transactions contemplated by the Purchase Agreement are undertaken by

Buyer, in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale shall not affect the validity of the sale to Buyer, unless such authorization is duly stayed pending such appeal. Buyer is a good-faith purchaser, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

20.    The Sale approved by this Order is not subject to avoidance and no damages may be awarded pursuant to section 363(n) or any other section of the Bankruptcy Code.

21.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Estate, and the successors and assigns of each of the foregoing, and any affected third parties, notwithstanding conversion or dismissal of the Debtor's bankruptcy case.

22.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by the Chapter 11 Trustee and Buyer, and in accordance with the terms of the Purchase Agreement, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Estate of the Debtor.

23.    The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

24.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded to act to cancel any of the Encumbrances.

25.    All entities that are presently, or may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer.

26.    Nothing contained in any plan of reorganization (or liquidation) confirmed in this case or the order of confirmation confirming any such plan of reorganization shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

27.    The provisions of this Order are nonseverable and mutually dependent.

28.    The provision of Bankruptcy Rule 6004(h) staying the effectiveness of this Order for fourteen days is hereby waived and this Order shall be effective, and the parties may consummate the Purchase Agreement, immediately upon entry.

Dated: May 29, 2018

Melvin S. Hoffman
United States Bankruptcy Judge

743770

EXHIBIT B

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is entered into as of May 25, 2018, by and between Harold B. Murphy, in his capacity as the duly appointed chapter 11 trustee (the "**Trustee**" or the "**Seller**") for the bankruptcy estate (the "**Estate**") of New England Confectionery Company, Inc., a Delaware corporation ("**NECCO**"), the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and Round Hill Investments LLC, a Delaware limited liability company (the "**Purchaser**").

### Introduction

WHEREAS, on the terms and subject to the conditions set forth herein, the Purchaser wishes to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Purchased Assets (as defined below), which will be sold to the Purchaser pursuant to the Sale Approval Order (as defined below). The purchase and sale of the assets and the other transactions contemplated hereby are sometimes collectively referred to herein as the "**Transactions.**"

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### THE TRANSACTIONS; CLOSING

**1.1 Purchase and Sale of Purchased Assets.** Pursuant to Sections 363 and 365 of the Bankruptcy Code, subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties contained herein, at the Closing, the Purchaser shall purchase from the Seller, and the Seller, on behalf of NECCO and the Estate, shall sell, convey, transfer, assign and deliver to the Purchaser, free and clear of all liens (including, but not limited to, any "lien" as defined in Section 101(37) of the Bankruptcy Code), claims (including, but not limited to, any "claim" as defined in Section 101(5) of the Bankruptcy Code), security interests, mortgages, encumbrances, interests and restrictions of every kind (collectively, "**Liens**"), all right, title and interest of NECCO, NECCO or the Estate in, to and under all of the following assets (collectively, the "**Purchased Assets**") on an "**AS IS**" "**WHERE IS**" basis with no representations and warranties of any kind except as are specifically provided for herein:

(a)    all credits, deferred charges, advanced payments, deposits (including customer deposits and security deposits for rent, but excluding utility deposits) and prepaid charges and expenses of NECCO and/or the Estate;

(b)    the Assumed Contracts (as defined below);

(c)    all rights, claims, causes of action and credits of NECCO, to the extent relating directly to any Purchased Asset or Assumed Liability (as defined below), including, without limitation, any such item arising under any guarantee, warranty, indemnity, right of recovery, right of set-off or similar right of NECCO in respect of any Purchased Asset or Assumed Liability;

(d)    all rights under nondisclosure, confidentiality or similar agreements entered into with third parties in connection with the sale of the Business or any part of the Business;

OMM US:76285949.7

(e)      all accounts receivable held by or owed to NECCO and/or the Estate, including, without limitation, all accounts receivable and charged-off accounts receivable as of the close of business on the date prior to the date hereof, as listed on the attached <u>Schedule 1.1(e)</u> (the "**Receivables**") and, for the avoidance of doubt, all Documents relating to such Receivables, whether in tangible or electronic form, including invoices, purchase orders, proof of shipping and delivery, contracts of purchase, warranties, correspondence and customer data (including customer lists, mailing lists, email address lists, sales records, customer files and account histories);

(f) all raw materials, work-in-process and finished goods, and other items of inventory (collectively, "**Inventory**") owned by NECCO and/or the Estate, including, without limitation, all Inventory listed or described on <u>Schedule 1.1(f)</u> attached hereto and incorporated herein by this reference;

(g)      all tangible assets, including all machinery, equipment (including but not limited to the cogeneration facility and all related equipment located at the Facility), tools, vehicles, computer equipment, software, furniture and fixtures, artwork, pictures, tradebooths, office supplies, tools, rolling stock, molds, dies, tooling, leasehold improvements and other property and equipment owned or used by NECCO and/or the Estate, including, without limitation, all of the foregoing items listed or described on <u>Schedule 1.1(g)(i)</u> attached hereto and incorporated herein by reference but excluding all tangible assets previously sold, whether sold to Hershey or one or more of its Affiliates or otherwise and listed on <u>Schedule 1.1(gKii)</u>; provided, that, the foregoing shall not include any assets used but not owned by NECCO and/or the Estate that arise from Excluded Contracts;

(h)      all databases, customer lists, mailing lists, documentation and agreements related to offers to purchase NECCO or any of NECCO's and/or the Estate's assets (including any contact information for such offerees), internet servers, and intellectual property and related rights owned or used by NECCO and/or the Estate, including patents, trademarks, tradenames, service marks, domain names, copyrights (including but not limited to the registered patents, trademarks, copyrights and domain names set forth on <u>Schedule 1.1(h)V.</u> and other similar designations of source or origin (and all applications and registrations for the foregoing), trade secrets, know how, all historic catalogs, engineering, artwork, copywriting, document and data files, images, pictures, photos, creative copy and drafts, brochures, catalogues, brand logos, corporate photographs, recipes, designs, artwork design and copy for current and future catalogs and marketing materials, including the "New England Confectionery Company, Inc." and "NECCO" names and all variations thereof, and all goodwill and other intangible assets primarily associated with each of the foregoing items and the Business; provided, that, the foregoing shall not include any assets used but not owned by NECCO and/or the Estate that arise from Excluded Contracts;

(i)      to the extent applicable, all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets (the "**Certificate of Title**");

(j)      all warranties, guarantees and similar rights related to the Purchased Assets, including, without limitation, warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Assumed Contracts;

(k)      bank account number 1010109227 of NECCO and/or the Estate located at Eastern Bank (the "**Bank Account**");

(l)      all approvals, authorizations, consents, franchises, licenses, permits, waivers, grants, concessions, exceptions, registrations or certificates of governmental and nongovernmental

2
OMM US:76285949.7

authorities held by NECCO and/or the Estate, or Seller on behalf of NECCO and/or the Estate, that are related to the Purchased Assets (collectively, the "**Permits**"), including, but not limited to, the foregoing items listed or described on **Schedule 1.1(B**; and

        (m)    all Documents (as defined below) (other than documents related to Employees (as defined below)), including, without limitation, customer and supplier lists and Documents relating to products, services, marketing, advertising, promotional materials, and all files, customer files, sales information and documents (including credit information), supplier lists, records, literature and correspondence, that are located at the Facility and related to the Purchased Assets.

    1.2    **Excluded Assets.** The Purchaser expressly understands and agrees that it is not purchasing or acquiring, and the Seller is not selling or assigning any assets of NECCO and/or the Estate other than the Purchased Assets, including the following assets and properties of NECCO and/or the Estate (the "**Excluded Assets**"):

        (a)    all cash and cash equivalents, bank accounts (other than the Bank Account, but excluding all cash in the Bank Account immediately prior to the Closing) and securities of NECCO and/or the Estate;

        (b)    (i) the corporate seals, organizational documents, minute books, stock books, tax returns or other records that Seller and/or NECCO are required by applicable to retain or that Seller reasonably determines is necessary or advisable to retain, provided that Purchaser shall have the right to make copies of any portions of such items that relate to the Business or any of the Purchased Assets; (ii) all Employee-related or Employee benefit-related files or records; and (iii) any other books and records related to Employees which the Seller and/or NECCO are prohibited from disclosing or transferring to Purchaser under applicable law and are required by applicable law to retain;

        (c)    all insurance policies of Seller and/or NECCO and all rights to applicable claims and proceeds thereunder;

        (d)    all rights to any action, suit or claim of any nature available to or being pursued by the Seller, on behalf of NECCO and/or the Estate, whether arising by way of counterclaim or otherwise, other than any rights to any action, suit or claim related to the Purchased Assets;

        (e)    all benefit plans and trusts or other assets attributable thereto;

        (0    the rights which accrue or will accrue to the Seller, on behalf of NECCO and/or the Estate, under this Agreement, any other agreement, document or instrument entered into by the Seller, on behalf of NECCO and/or the Estate, in connection with this Agreement or in connection with the Transactions; and

        (g) all rights arising under any Excluded Contract.

    1.3    **Assumed Liabilities; Excluded Liabilities.**

        (a)    **Assumed Liabilities.** On the Closing Date, Purchaser shall assume and agree to fulfill, perform, pay and discharge when due (or cause to be fulfilled, performed, paid or discharged when due), only the following Liabilities (to the extent not fulfilled, performed, paid or discharged prior to Closing)

OMM US:76285949.7

(the "**Assumed Liabilities**"):

(1)     all Cure Payments (as defined below); and

(2)     the Liabilities of NECCO and/or the Estate arising under each Assumed Contract, to the extent such Liabilities arose from and after the effective date of assumption of such Assumed Contract as provided in the applicable Supplemental Assumption Order (as defined below) (and subject to the other terms and conditions of this Agreement, Purchaser shall, from and after such date, satisfy and perform all of the Liabilities related to such Assumed Contract when the same are due thereunder).

(b)     **Excluded Liabilities.** Notwithstanding anything to the contrary in this Agreement, neither the Purchaser nor any of its Affiliates shall assume, be obligated to pay, perform or otherwise discharge or in any way be responsible for any Liabilities of the Seller, NECCO and/or the Estate or any of their respective Affiliates (whether or not disclosed) of any kind, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that Purchaser is not assuming being referred to collectively as the "**Excluded Liabilities**"). Without limiting the generality of the foregoing, neither the Purchaser nor any of its Affiliates will assume:

(1)     any Taxes NECCO and/or the Estate, or NECCO and/or the Estate, or any of their respective Affiliates, any sales Tax associated with the transfer of the Purchased Assets from Seller on behalf of NECCO and/or the Estate to Purchaser pursuant to this Agreement, or any Property Tax imposed upon the Purchased Assets through the Closing Date;

(2)     any Liability relating to any benefit plans (including, without limitation, the Employee Compensation Plans), Employees or contractors of the Seller, NECCO and/or the Estate or any of their respective Affiliates;

(3)     any obligation of the Seller under this Agreement or any other agreement, document or instrument entered into by the Seller in connection with this Agreement;

(4)     any obligation of the Seller incurred in connection with the Transactions, including all amounts in respect of legal, investment banking, financial advisor, broker and other similar fees, costs, expenses and obligations;

(5)     any Indebtedness;

(6)     any Liability arising out of any action, arbitration, claim, proceeding or litigation of any nature (whether or not disclosed) against the Seller, NECCO and/or the Estate or any of their respective Affiliates or relating to the operation of the Business;

(7)     any Liability arising out of the Seller's, NECCO's and/or the Estate's or their respective Affiliates' violation of any Legal Requirement;

(8)     any Liability arising under any Excluded Contract, and any Liability arising out of the failure of the Seller, NECCO and/or the Estate or their respective Affiliates to comply with any such Excluded Contract;

(9)     any Liability to any stockholder of the Seller or NECCO or to any Affiliate

4
OMM US:76285949.7

of Seller or NECCO;

        (10)    any Liability of the Seller arising out of or relating to the Bankruptcy Case; or

        (11)    any other Liabilities of Seller, NECCO and/or the Estate relating to the use of the Purchased Assets prior to the Closing or any other actions or inaction by Seller, NECCO and/or the Estate prior to the Closing, including but not limited to, leading to the loss of life or loss of property.

    **1.4**    **Certain Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated below:

    **"Acquired IP"** shall mean all Intellectual Property owned or purported to be owned by Seller, including Intellectual Property Registrations.

    **"Action"** means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

    **"Affiliate"** means, with respect to a specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person.

    **"Assumed Contract"** means each Contract assumed by Seller on behalf of NECCO and/or the Estate and assigned to Purchaser in accordance with the Assumption Procedures and pursuant to a Supplemental Assumption Order.

    **"Bankruptcy Code"** means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

    **"Bidding Procedures Order"** means that certain *Order on Trustee's Motion (A) to Approve Bidding Procedures, Notice Procedures, and Breakup Fee in Connection with Motion for Order Approving Private Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) to Authorize Trustee to Effectuate Sale Pursuant to Terms of Asset Purchase Agreement as Amended, and (C) for Related Relief* entered by the Bankruptcy Court on May 2, 2018.

    **"Business"** means NECCO's business of manufacturing, marketing, selling and distributing candy and other products (including, without limitation, NECCO wafers, Sweethearts conversation hearts, Mary Jane, Clark Bar, Skybar, Mighty Malt and Haviland Thin Mints) but excludes any operations conducted with the Excluded Assets or relating to the Excluded Liabilities.

    **"Contract"** means any contract, agreement, commitment, promise or undertaking (including any evidence of Indebtedness, lease, instrument, license, purchase order or other legally binding agreement), whether written or oral.

    **"Copyrights"** shall mean U.S. and foreign registered and unregistered copyrights, data and database rights, moral rights of authors and rights in semiconductor topologies, and mask works, and all registrations and applications to register the same.

OMM US:76285949.7

"**Cure Payments**" means, with respect to each Assumed Contract, the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under such Assumed Contract on or before the date on which Seller served the applicable Assumption Notice (as defined below), as such cure amounts are determined by the Bankruptcy Court pursuant to a Supplemental Assumption Order (as defined below).

"**Deposit Amount**" means the sum of $750,000.00 paid by Purchaser to Seller on May __, 2018, constituting the "Deposit" as defined in the Bidding Procedures Order.

"**Documents**" means all files, documents, instruments, papers, books, records, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer, distribution and supplier lists, invoices, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, production and user manuals, training materials, release notes, working papers, etc.), manufacturing and quality control records and procedures, maintenance and engineering records, marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials in the possession or under the control of Seller, NECCO and/or the Estate, in each case whether or not in electronic form.

"**Employee Compensation Plans**" means, collectively, the "Prepetition Compensation Plans," the "Modified Management Plan" and the "Modified Retention/Severance Plans" as such terms are defined in *the Motion by Trustee for Entry of Order Authorizing Estate to Enter into Employee Compensation Plans* filed by Seller in the Bankruptcy Case on May 16, 2018, at Docket No. 162.

"**Employees**" means all current and former employees of NECCO or its Affiliates.

"**Excluded Contract**" means any Contract that is not an Assumed Contract.

"**Facility**" means the property locally known and numbered as 153 American Legion Highway, Revere, Massachusetts.

"**Fundamental Representations**" means the representations set forth in Section 2.E Section 2.2, Section 2.3, the last sentence of Section 2.5, the first sentence of Section 2.6, Section 3.E Section 3.2, Section 3.3 and Section 3.4.

"**Indebtedness**" means all principal, interest, fees, expenses and other amounts in respect of borrowed money, notes, bonds, debentures and other debt securities, guarantees, interest rate, currency or other hedging arrangements, capital leases, letters of credit and/or installment purchases incurred by the Seller on behalf of NECCO and/or the Estate, or NECCO and/or the Estate, or any of their respective Affiliates, or required to be paid in order to discharge fully all such amounts.

"**Intellectual Property**" shall mean, collectively, all of the rights, title or interest in any of the following, arising under the Laws of the U.S., any state, any other country, or international treaty regime, whether or not filed, perfected, registered or recorded, including all renewals and extensions thereof: (a) Trademarks; (b) Patents; (c) Copyrights, rights of publicity (and other rights to use the names and likenesses of individuals); (d) Trade Secrets and rights to limit the use or

OMM US:76285949.7

disclosure thereof by any Person; (e) Internet domain names; (f) design rights; (g) all rights in databases and data collections; (h) all moral and economic rights of authors and inventors, however denominated, (i) claims, causes of action and defenses relating to the enforcement or protection of any of the foregoing, including remedies against infringement or misappropriation thereof, whether such infringement or misappropriation occurs before or after the Closing; (j) know-how, show-how and residual knowledge applicable to the Acquired Assets; and (k) any similar or equivalent rights to any of the foregoing (as applicable).

"**Intellectual Property Registrations**" means any and all of the following owned by, or filed in the name of, NECCO and/or the Estate: (i) Patents; (ii) registered Trademarks and applications to register Trademarks, including intent-to-use applications; (iii) registered Copyrights and applications to register Copyrights; (iv) registrations for Internet domain names; and (v) any other application, certificate, filing, registration or other document issued by, filed with, or recorded by, any private, state, government or other public or quasi-public legal authority in connection with any Intellectual Property.

"**Legal Requirements**" means, with respect to any Person, all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, orders, rules, regulations, policies and guidelines, in each case of any governmental entity, applicable to such Person.

"**Liability**" means any debt, obligation or liability of any nature, whether known or known, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"**Motion for Sale Order**" means *Trustee's Motion (A) to Approve Bidding Procedures, Notice Procedures, and Breakup Fee in Connection with Motion for Order Approving Private Sale of Substantially All Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) to Authorize Trustee to Effectuate Sale Pursuant to Terms of Asset Purchase Agreement as Amended, and (C) for Related Relief* filed on May 2, 2018, at Docket No. 124 in the Bankruptcy Case.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any governmental body.

"**Patents**" shall mean issued U.S. and foreign patents and pending patent applications (including provisional patent applications), patent disclosures, utility models, design registrations, certificates of invention and similar statutory rights, and other governmental grants for the protection of inventions or industrial designs, and any and all divisionals, continuations, continuations-in-part, reissues, reexaminations, and extensions thereof.

"**Person**" means any natural person or corporation, limited liability company, partnership, trust, other business entity, governmental authority or non-governmental authority.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date, including the portion of any Straddle Period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period or portion thereof ending on or before the Closing Date, including the portion of any Straddle Period ending on or before the Closing

7

Date.

"**Property Taxes**" means any real property, personal property and any similar ad valorem Taxes.

"**Purchase Price**" means $17,330,000 payable in cash as follows: $16,330,000 at Closing (the "First Payment") followed by additional payments of $250,000 due on June 30, 2018; $250,000 due on July 31, 2018; $250,000 due on August 31, 2018; and $250,000 due on September 30, 2018 and the assumption of the Assumed Liabilities. The Purchase Price shall be reduced (i) to the extent Seller fails to deliver to Purchaser accounts receivable with an aggregate face amount of at least $6,975,447, by an amount equal to $0.70 for each dollar which the face amount of accounts receivable the Purchaser receives from Seller is less than $6,975,447, (ii) to the extent Seller fails to deliver to Purchaser finished inventory held for sale in the ordinary course of business with a cost value of at least $2,660,196.06, by an amount equal to $0,509 for each dollar of cost value below $2,660,196.06 that the Purchaser receives, (iii) to the extent Seller fails to deliver to Purchaser packaging with a cost value of at least $2,822,904.69, by an amount equal to $0,365 for each dollar of cost value below $2,822,904.69 that the Purchaser receives, (iv) to the extent Seller fails to deliver to Purchaser work-in-process with a cost value of at least $1,415,690.30, by an amount equal to $0,402 for each dollar of cost value below $1,415,690.30 that the Purchaser receives, and (v) to the extent Seller fails to deliver to Purchaser ingredients with a cost value of at least $792,920.21, by an amount equal to $0,365 for each dollar of cost value below $792,920.21 that the Purchaser receives (adjustments made pursuant to clauses (i) through (v) above, collectively, the "**Purchase Price Reduction**").

"**Sale Approval Date**" means the date on which the Bankruptcy Court enters the order of the Bankruptcy Court approving the Motion for Sale Order.

"**Sale Approval Order**" means an order entered by the Bankruptcy Court: (i) that was on appropriate notice to all parties entitled to notice of any motion relating to the Purchased Assets, this Agreement or the transactions contemplated hereby; (ii) that is not subject to a stay pending appeal; (iii) that is in form and substance satisfactory to Purchaser; and (iv) that provides, at least, the following: (a) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens and all Liabilities of any kind or nature whatsoever, whether at law or in equity, including, without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable law, whether arising before or after the filing of NECCO's involuntary petition for relief under chapter 7 of the Bankruptcy Code, save and excepting only those Liabilities expressly assumed by Purchaser in writing under this Agreement; (b) Purchaser is not a successor to Seller or NECCO and has acted in "good faith" within the meaning of and is entitled to the protections of section 363(m) of the Bankruptcy Code; (c) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; and (d) this Agreement and the transactions contemplated hereby may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Seller, on behalf of NECCO and/or the Estate, or any subsequent chapter 7 or chapter 11 trustee of NECCO or other representative of the Estate; and (e) the Assumption Procedures are approved.

"**Straddle Period**" means any taxable period that begins before, and ends after, the Closing

Date.

"**Tax**" means any federal, state, local or non-U. S. income, alternative or add-on minimum tax, gross income, gross receipts, net receipts, sales, use, ad valorem, value added, goods and services, transfer, registration, franchise, profits, license, capital stock, social security, withholding, payroll, superannuation guarantee charge, employment, unemployment, disability, excise, severance, stamp, occupation, premium, real property, personal property, environmental or windfall profit tax, escheat, estimated or any other tax, customs duty, governmental fee or other like assessment or charge of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis, or in any other manner, that is imposed by any governmental entity, together with any interest, penalty or addition to tax imposed with respect thereto (whether disputed or not), and any liability in respect of any of the items described herein payable under a tax sharing, allocation, indemnity or similar agreement or by reason of successor, transferee, or other liability, by contract, operation of law, or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereto or any analogous or similar provision of state, local or foreign Law).

"**Tax Returns**" means all reports, estimates, declarations of estimated Tax, information statements and returns relating to, or required to be filed in connection with, any Taxes and any schedules attached to or amendments of (including refund claims with respect to) any of the foregoing.

"**Trademarks**" shall mean U.S. and foreign registered and unregistered trademarks, trade dress, service marks, trade names, logos and all registrations and applications to register the same, and the goodwill associated with any of the foregoing.

"**Trade Secrets**" shall mean information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"**TSA**" means a Transition Services Agreement between the Seller, on behalf of NECCO and/or the Estate, and the Purchaser in the form attached hereto as **Exhibit 1.4(cT**

1.5     **Closing**. The Transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely by the electronic exchange of documents and signatures (or at such location as the parties may designate in writing) on the date that is one business day following entry of the Sale Approval Order, or such other date as agreed to in writing by the Seller and the Purchaser (the "**Closing Date**").

1.6     **Payments at Closing**. At the Closing, the Purchaser will make or cause to be made the following payments of the First Payment (subject to any Purchase Price Reduction) *(less* the Deposit Amount which shall be retained by Seller and applied to the Purchase Price) by wire transfer as follows: (i) first, to Atlantic-Revere Realty LLC ("**Landlord**"), $2,303,101.54 (or such lesser or greater amount as Seller and Purchaser mutually agree is owed to the Landlord) as a prepayment of all rent and additional rent owed to Landlord between April 1, 2018 and November 30, 2018 pursuant to the Indenture of Lease dated April 24, 2017 between Seller and Landlord (the "**Lease**"), and (ii) second, the balance of the First Payment to the Seller.

OMM US:76285949.7

**Additional Payments** Following the Closing, the remaining $1,000,000 of the Purchase Price shall be paid by the Purchaser to the Seller in four installments as follows: $250,000 on June 30, 2018; $250,000 on July 31, 2018; $250,000 on August 31, 2018 and $250,000 on September 30, 2018.

1.7    **Other Payments.** Any payments due to the Seller, NECCO and/or the Estate by Landlord pursuant to Section 20.4 of the Lease (the "**Landlord Escrow**"), shall be paid 100% to Purchaser. That portion of the Landlord Escrow due to the Purchaser (the "**Purchaser Escrow**") shall be paid within five (5) business days upon receipt by the Seller along with a detailed accounting detailing the amount received by the Seller and any deduction made to the Landlord Escrow made by the Landlord. The parties hereto acknowledge that the Seller may deduct from the Purchaser Escrow all amounts due to the Seller on account of the Purchaser's indemnification obligations contained in Section 6.3 herein.

1.8    **Reserved.**

1.9    **Abandonment.** The parties acknowledge and agree that (a) the Purchaser has the right in its sole discretion to abandon any of the Purchased Assets at any time, (b) the Purchaser shall have no obligation under this Agreement or otherwise to the Seller, NECCO and/or the Estate with respect to any Purchased Assets that are abandoned by Purchaser, provided that the Seller shall have the right to remove any Purchased Assets abandoned by the Purchaser for purposes of the Landlord Escrow described above in Section 1.8, and (c) the Seller shall have no obligation under this Agreement or otherwise to the Purchaser for any Purchased Assets subsequently abandoned by the Purchaser.

1.10    **Non-Assignment of Assets.**

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not affect the assignment or transfer of any Purchased Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "**Necessary Consent**"), would constitute a breach, default or violation thereof or of any applicable law or in any way adversely affect the rights of Purchaser thereunder and (ii) the Bankruptcy Court has not entered an order providing that such Necessary Consent is not required. In such event, such assignment or transfer is subject to such Necessary Consent being obtained and Seller and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Purchaser as Purchaser may reasonably request; provided, however, that Seller will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval. If such Necessary Consent is not obtained, or if an attempted assignment or transfer thereof would be ineffective or would adversely affect the rights of Purchaser to such Purchased Asset following the Closing, Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to Seller, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which Seller would enforce for the benefit of Purchaser all of its rights thereunder and with Purchaser assuming Seller's obligations and any and all rights of Seller against a third party thereto.

(b)    Subject to Section 1.11(a). if after the Closing (i) Purchaser holds any Excluded Assets or Excluded Liabilities or (ii) Seller, NECCO and/or the Estate holds any Purchased Assets or

Assumed Liabilities, such party shall promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party. Prior to any such transfer, the party receiving or possessing any such asset shall hold it in trust for such other party.

**ARTICLE 2**
**REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER**

The Seller represents and warrants to the Purchaser that the following is true and correct:

2.1   **Organization, Power and Standing.** NECCO is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, lease and operate its properties and to carry on the Business. NECCO is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on the Purchased Assets. The Trustee has been duly appointed as trustee for NECCO and has all requisite power and authority to proceed with the Transactions.

2.2   **Due Authorization; No Conflict.** The Seller has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and (subject to entry of the Sale Approval Order) to carry out the terms of this Agreement and the other agreements, instruments and documents of the Seller contemplated hereby. Except as specified on **Schedule 2.2** (the "Required Consents") and subject to entry of the Sale Approval Order, no consent, order, authorization, approval, declaration or filing with any Person, is required on the part of the Seller for or in connection with its execution, delivery or performance of this Agreement or any of the other agreements, documents and instruments contemplated hereby. Subject to obtaining the Required Consents specified on **Schedule 2.2** and subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Seller will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under, any Legal Requirement or agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or Permit to which the Seller is a party or by which the Seller or Purchased Assets are bound.

2.3   **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Seller is a party shall be when executed and delivered by the Seller, the valid and binding obligations of the Seller enforceable in accordance with its terms, subject only to entry of the Sale Approval Order.

2.4   **Compliance With Laws.** To the Seller's knowledge, Seller is, and has been for the past three (3) years, in compliance in all material respects will all applicable Legal Requirements. Neither Seller nor any of its Affiliates nor any of their respective directors or officers has received any pending unresolved written notice of any Action, demand or claim relating to the Purchased Assets, in each case alleging any material noncompliance with any Legal Requirements.

2.5   **Condition of Purchased Assets.** The condition and status of the Purchased Assets has not materially changed from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on May 16, 2018; provided that, subject to the "Purchase Price" definition and Section 5.1(/) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed. To the Seller's knowledge, at the Closing, the Purchaser will acquire from the Seller good and marketable title to the Purchased Assets, free and clear of

11

OMM US:76285949.7

all Liens.

**2.6   Title to Purchased Assets.** To the Seller's knowledge, Seller, on behalf of NECCO and/or the Estate, has good and valid title to the Purchased Assets and, at the Closing, Purchaser shall acquire good and marketable title in, and under all of such Purchased Assets, in each case, free and clear of all Liens and encumbrances to the fullest extent permitted under Section 363(f) of the Bankruptcy Code. The Purchased Assets include all of the properties and assets required to operate the Business in the ordinary course of business consistent with past practice. The right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Purchaser only through the assumption and assignment of the Assumed Contracts in accordance with and subject to this Agreement.

**2.7   Permits.** The Permits include, and the Seller is in compliance in all material respects with, all of the permits required to carry on the Business through November 30, 2018. All of the Permits are in full force and effect and will be in full force and effect and held by the Purchaser immediately after giving effect to the Transactions. The Seller does not know of any threatened suspension, revocation or invalidation of any such Permits, or any basis therefor, except for the alleged violations and remedial obligations set forth in, collectively, (i) that certain letter dated May 16, 2018 from the United States Food and Drug Administration ("FDA"); and (ii) that certain form FDA Form 483 issued as of December 22, 2017 by the Department of Health and Human Services of the FDA to NECCO.

**2.8   Litigation.** Except as set forth on **Schedule 2.8** and except for the Bankruptcy Case, no action, arbitration, suit, proceeding or investigation is pending or, to the knowledge of the Seller, threatened against the Seller, NECCO and/or the Estate, or any equity holder, former equity holder, officer, director, manager or employee of NECCO and/or the Estate, in each case, regarding the Purchased Assets. Except as set forth on **Schedule 2.8,** the matters disclosed on such Schedule will be covered by the Seller's insurance policies.

**2.9   Employees.** To the Seller's knowledge, Seller is in compliance in all material respects with all Laws relating to the employment of, classification of, and termination of employment of the Employees.

**2.10   Environmental Matters.** To the Seller's knowledge, there is and will be no Liability attaching to the Purchaser or the Purchased Assets as a result of any hazardous substance that may have been discharged on or released from any premises owned or operated by NECCO and/or the Estate (including any predecessors or subsidiaries) or in connection with the Purchased Assets, or disposed of on-site or off-site. For purposes of this Section, "hazardous substance" shall mean oil or any other substance which is included within the definition of a "hazardous substance," "pollutant," "toxic substance," "toxic waste," "hazardous waste," "contaminant" or other words of similar import in any foreign, federal, state or local environmental Legal Requirement.

**2.11   Intellectual Property.**

To the Seller's knowledge:

(a)   Each Intellectual Property Registration is subsisting, and is valid and enforceable. All necessary registrations, maintenance and renewal fees currently due in connection with the Intellectual Property Registrations have been made. There are no Patents in the Intellectual Property Registrations that are non-published and subject to a Terminal Disclaimer under 37 C.F.R. § 1.321 that require any of such to remain under common ownership.

OMM US:76285949.7

(b)     NECCO and/or the Estate exclusively owns, and has full good and marketable title, right and interest to, the Acquired IP, free and clear of all Liens and encumbrances. At Closing, the Acquired IP will be fully transferable, alienable, and licensable by or at the direction of Buyer without restriction and without payment of any kind to any Person. NECCO and/or the Estate have not granted any exclusive license of or exclusive right to use or exploit, or authorized the retention of any exclusive rights to use or exploit, any Acquired IP.

2.12    **Validity of Assumed Contracts.** To the Seller's knowledge, each Assumed Contract is a valid and binding obligation of NECCO and/or the Estate and the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, as such enforceability may be limited by applicable bankruptcy, insolvency or other similar Laws affecting or relating to enforcement of credit rights generally or general principles of equity. Seller has not, and, to the knowledge of the Seller, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent any such default or violation will be dismissed as a result of the entry of the Sale Approval Order.

2.13    **No Other Representations and Warranties.** Except for the representations and warranties contained in this Article 2. neither the Seller, any equity holder of the Seller, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Seller and the Seller hereby disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any director, officer, employee, agent, consultant, or representative of the Seller or any of its Affiliates). **The Purchaser acknowledges that, except as otherwise specifically provided for in this Agreement, the Purchased Assets are being sold to the Purchaser on an "AS IS" "WHERE IS" basis with no representations or warranties of any kind.**

2.14    **Real Property.** NECCO and/or the Estate do not own any real property or title to real property, and do not have any contractual option to own any real property or title to real property.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller that the following is true and correct.

3.1    **Organization, Power and Standing.** The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to effect the Transactions. The Purchaser is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on this Transaction.

3.2    **Due Authorization.** The Purchaser has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Purchaser contemplated hereby.

13
OMM US:76285949.7

3.3    **No Conflict.** No consent, approval or authorization of or declaration or filing with any governmental or non-governmental authority or any party to any contract with the Purchaser is required on the part of the Purchaser for or in connection with its execution, delivery or performance of this Agreement and the other agreements, documents and instruments contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Purchaser will not result in any violation of, be in conflict with, or constitute a default under any Legal Requirement, agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or permit to which the Purchaser is a party or by which the Purchaser is bound.

3.4    **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Purchaser is a party shall be when executed and delivered by the Purchaser, the valid and binding obligations of the Purchaser enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

3.5    **No Other Representations and Warranties.** Except for the representations and warranties contained in this <u>Article 3</u>, neither the Purchaser, any equity holder of the Purchaser, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Purchaser and the Purchaser hereby disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Seller or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Seller by any director, officer, employee, agent, consultant, or representative of the Purchaser or any of its Affiliates).

**ARTICLE 4**
**COVENANTS**

4.1    **Conduct of Business Pending the Closing.** From the date hereof until the Closing, Seller shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, (x) to operate the Business in the ordinary course of business consistent with past practice and (y) to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and
Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with Seller in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the ordinary course of business consistent with past practice and (F) continue to operate the Business and Purchased Assets in all material respects in compliance with all Laws applicable to the Business and Seller.

4.2    **Tax Matters.**

(a)    NECCO and/or the Estate shall be responsible for all Property Taxes imposed upon the Purchased Assets with respect to a Pre-Closing Tax Period and, to the extent such Taxes do not relate to a Straddle Period (as defined below), the Seller, on behalf of NECCO and/or the Estate, shall pay such Property Taxes directly to the appropriate taxing authority when due. Property Taxes for any Straddle Period

14
OMM US:76285949.7

shall be allocated (a) to the Pre-Closing Tax Period based on the total amount of such Property Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date, and the denominator of which is the number of days in the entire taxable period and (b) to the Post-Closing Tax Period based on the total amount of such Property Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period beginning with the day immediately following the Closing Date and ending with the last day of the applicable taxable period, and the denominator of which is the number of days in the entire taxable period. Any credits relating to a Straddle Period shall be allocated on a basis consistent with the allocations made pursuant to the preceding sentence. Seller, on behalf of NECCO and/or the Estate, shall pay to (or as directed by) the Purchaser the amount of any unpaid Property Taxes for any Straddle Period attributable to a Pre-Closing Tax Period in each applicable case by no later than five (5) business days prior to the due date for paying such amount of Property Taxes to the relevant taxing authority. The Purchaser shall reimburse Seller for all Property Taxes for any Straddle Period attributable to a Post-Closing Tax Period and paid by the Seller, on behalf of NECCO and/or the Estate, prior to the Closing within five (5) business days of Purchaser's receipt of a copy of the bill for such Property Taxes from the appropriate taxing authority and evidence of payment of such Property Taxes by Seller.

(b)     No later than 30 days prior to the due date for filing the U.S. federal income Tax Return for the year in which the sale of the Purchased Assets occurs, Purchaser shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets for U.S. federal, state, local and foreign income and franchise Tax purposes. Purchaser and Seller and their respective Affiliates shall report, act and file Tax Returns in all respects and for all purposes consistent with such allocation prepared by the Purchaser. Neither the Purchaser nor Seller shall take any tax position (whether in audits, Tax Returns or otherwise) with respect to the mutually approved allocation which is inconsistent with such allocation, unless (and then only to the extent) required by a "determination" within the meaning of Section 1313(a) of the Code.

(c)     The Seller shall be responsible for any and all excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes, levies, charges and fees incurred in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Purchaser and the Seller shall reasonably cooperate to lawfully mitigate any such Transfer Taxes, including by filing any certificates or forms necessary to make any available claim(s) for exemption or reduction. The Seller will, at its own expense, file all necessary Tax Returns with respect to all Transfer Taxes, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

4.3     **Cogeneration Facility and Utilities.** The Seller covenants and agrees to maintain and continually operate the cogeneration facility located at the Facility in accordance with the terms of the Lease through the earlier of (x) the date upon which the Purchaser sells such cogeneration facility and (y) November 30, 2018, and to provide Purchaser with heat/ air conditioning, steam and electricity in the Facility through such date and (b) make available for Purchaser's use at the Facility through November 30, 2018 internet, telephone, and other utilities as required by the Purchaser. To the extent the Seller maintains and continually operates the cogeneration facility located at the Facility in accordance with the immediately preceding sentence, the Seller shall retain all amounts paid by National Grid in connection with its continued operation of the co-generation facility through such date.

4.4     **Access to Information.** From the date hereof through the Closing Date, Purchaser and its

representative shall have the right to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as Purchaser and its representatives reasonably request and to make extracts and copies of such books and records. Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable law. Seller will direct and use its best efforts to cause its and NECCO's respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives will cooperate with Seller and NECCO and their respective representatives. Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would violate attorney-client privilege. No investigation by Purchaser prior to or after the date of this Agreement will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Seller contained in this Agreement. Seller will promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to the Business, the Purchased Assets and the transactions contemplated by this Agreement.

4.5    **Use of Names.** After the Closing, Seller shall, and shall cause NECCO and/or the Estate to promptly discontinue use of and, as applicable, remove from any buildings, signs, vehicles or other asset or property of NECCO and/or the Estate, all purchased trademarks, including "NECCO Wafers", "Sweethearts", "Candy Buttons", "Mary Jane", "Canada Mints", "Slapsticks", "Squirrel Nut Zippers", "Mighty Malts", "Haviland", "Clark Bars" and "Sky Bar" and any variations thereof, or any name, logo, trademark or similar intellectual property right that includes "NECCO Wafers", "Sweethearts", "Candy Buttons", "Mary Jane", "Canada Mints", "Slapsticks", "Squirrel Nut Zippers", "Mighty Malts", "Haviland", "Clark Bars" and "Sky Bar" and any variations thereof.

4.6    **Bank Account.** At the end of the day immediately preceding the Closing Date, Seller, on behalf of NECCO and/or the Estate, covenants and agrees to sweep all cash in the Bank Account to a separate bank account.

4.7    **Assumption Procedures.**

(a)    The procedures set forth below shall govern the assumption and assignment of certain Contracts that may be designated to be assumed by Seller pursuant to Section 365(b) of the Bankruptcy Code and assigned to Purchaser pursuant to Section 365(f) of the Bankruptcy Code (collectively, the **"Designated Contracts"**) in connection with the sale of the Purchased Assets and shall be approved pursuant to the Sale Approval Order (as such procedures may be modified with the prior written consent of Purchaser, the **"Assumption Procedures"**):

(1)    Purchaser shall have the right, in its discretion, for a period of up to one (1) month after the date on which Seller files a completed Schedule G (*Executory Contracts and Unexpired Leases*) for NECCO and/or the Estate (the **"Option Period"**) to specifically designate Contracts to be Designated Contracts as specified in one or more written notices (each, an **"Option Notice"**) to Seller; provided that such designation shall not result in an adjustment to the Purchase Price; provided, further, that if Seller files an amendment or supplement to such Schedule G to add one or more Contracts, the Option Period solely for any such added Contracts shall terminate one (1) month after the date on which Seller files such amendment or supplement; provided, further, that the Option Period shall be subject to the time limitations under Section 365(d)(4) of the Bankruptcy Code, subject to such extension(s) as may be granted by the Bankruptcy Court. If Purchaser fails to deliver an Option Notice prior to the expiration of the Option

Period with respect to any Contract (each, an **"Undesignated Contract"**), such Undesignated Contract shall not be assigned to and assumed by Purchaser and shall be deemed an Excluded Asset.

(2)     In the case of any Designated Contract that Seller seeks to assume and assign after the Closing Date pursuant to this Section 4.7, within three (3) business days following receipt of an Option Notice stating that a Contract is a Designated Contract, Seller shall file with the Court a written notice, in form and substance acceptable to Purchaser, of Seller's intent to assume and assign such Designated Contract (an **"Assumption Notice"**). The Assumption Notice shall include the proposed order authorizing the assumption and assignment of the Designated Contract, which order shall be in form and substance acceptable to Purchaser. Seller shall serve by email (if available) and by first class mail such Assumption Notice on each of the following parties (the **"Assumption Notice Parties"**): (i) each counterparty to any Designated Contract to be assumed or assigned by Seller (and its counsel, if known), at the notice address set forth in the Designated Contract (or if none, at the last known address available to Seller), (ii) the U.S. Trustee, (iii) proposed counsel to the Committee (if known), and (iv) counsel to Purchaser. Service of an Assumption Notice shall not constitute an admission that such Designated Contract is an executory contract or unexpired lease.

(3)     The Assumption Notice shall set forth the following information, to the best of Seller's knowledge: (i) a description of the Contract that Seller seeks to assume and assign, (ii) the name and address of the affected counterparties (and their known counsel), (iii) a description of the deadlines and procedures for filing objections to the Assumption Notice (as set forth below), and (iv) a good faith estimate of the cure amount required in connection with the Contract.

(4)     Within two (2) business days of a request by a counterparty under any Designated Contract, Purchaser shall serve on such requesting counterparty, by electronic mail, evidence of adequate assurance of future performance under the Designated Contract, which may include, to the extent available, (i) the legal name of the proposed assignee, (ii) relevant prior experience, and (iii) a contact person with the proposed assignee that counterparties may contact if they wish to obtain further information. Evidence of adequate assurance of future performance under the Designated Contract shall be sent to the counterparty without the need for the counterparty to execute a confidentiality agreement, provided that such counterparty shall keep the evidence of adequate assurance of future performance confidential and only use or disclose the evidence as may be necessary (i) to conduct due diligence on Purchaser and/or (ii) to object to a proposed assignment of its Designated Contract, provided, further, that such evidence shall be filed with the Court under seal, and the filing of such evidence under seal is authorized without further order of the Court.

(5)     A party in interest may object to an Assumption Notice solely with respect to the proposed cure amount contained therein and adequate assurance of future performance. Any such objection must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules and any orders of the Court, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof and (iv) be filed with the Court and served so that such objection is actually received by Seller and the Assumption Notice Parties no later than ten (10) business days after the date on which Seller served the applicable Assumption Notice.

(6)     If no timely objection is filed and served with respect to the Assumption Notice, each party to such Designated Contract shall be deemed to have consented to the cure amount set forth in such Assumption Notice and to the assumption and assignment of the Designated Contract, and

OMM US:76285949.7

Seller shall submit to the Court under certification of counsel a proposed order (a "**Supplemental Assumption Order**") authorizing the assumption and assignment of the Designated Contract (which Supplemental Assumption Order shall be in form and substance satisfactory to Purchaser), which may be entered by the Court without further notice or a hearing. Pursuant to such Supplemental Assumption Order, the assumption and assignment of the Designated Contract shall be automatically effective, and such Designated Contract shall constitute an Assumed Contract hereunder, in each case as of the date the applicable Assumption Notice is filed.

(7)     If a timely objection is properly filed and served on Seller and the Assumption Notice Parties in the manner specified above, the assumption and assignment of the applicable Designated Contract shall not be effective, and Seller shall not be entitled to entry of an order authorizing the assumption and assignment of the Designated Contract to Purchaser as of the date the applicable Assumption Notice is filed, unless and until an order is entered after (i) the parties resolve the objection consensually, or (ii) the Court overrules the objection. In the event a hearing is required to resolve an objection, Seller may notice the hearing on the proposed assumption and assignment, and objection, for a date that is at least seven (7) calendar days from the date of the filing of such objection or such other date agreed to by the parties in question or set by the Court based upon the exigencies of the circumstances surrounding such assignment. To the extent the objection is resolved or determined against Seller, Purchaser may reclassify such
Contract to be an Undesignated Contract on written notice to Seller within seven (7) calendar days after such resolution or determination. Within seven (7) calendar days after receipt of such notice from Purchaser, Seller shall file and serve upon the applicable counterparties a notice of such designation, and such Contract shall be deemed an Excluded Contract.

(8)     Any party who fails to timely file an objection to its scheduled cure amount listed on the Assumption Notice or to the assumption and assignment of a Designated Contract shall be forever barred from objecting thereto, including (i) making any demands for additional cure amounts or monetary compensation on account of any alleged defaults for the period prior to the applicable objection deadline against Seller, NECCO, the Estate and/or Purchaser, with respect to any such Designated Contract and (ii) asserting that the Purchaser has not provided adequate assurance of future performance, in each case except to the extent the Court orders otherwise for cause shown.

(b)     Upon entry of a Supplemental Assumption Order with respect to any Designated Contract, Seller shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate the assumption of the specified Contracts and Purchaser shall pay the Cure Amount, if any and provide any required adequate assurances of future performance.

(c)     From the Closing Date through the Option Period (the "**Contract Review Period**"), Seller shall not move to reject any Contract pursuant to Section 365 of the Bankruptcy Code (i) without giving at least three (3) business days' advance written notice to Purchaser or (ii) if Purchaser has agreed in writing to pay unpaid amounts arising under such Contract to the extent such unpaid amounts arose during the Contract Review Period, have been disclosed in writing to Purchaser and are due, owing and undisputed.

18
OMM US:76285949.7

## ARTICLE 5
## CONDITIONS TO OBLIGATIONS

**5.1 Conditions to Obligations of Purchaser.** Unless waived in writing by the Purchaser, at or prior to the Closing, the obligation of the Purchaser hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

(a)    **Representations and Warranties True.** The representations and warranties of the Seller contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

(b)    **Covenants Performed.** The Seller shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

(c)    **Purchased Assets.** The condition and status of the Purchased Assets shall be unchanged in any material respect from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on May 16, 2018; provided that, subject to the "Purchase Price" definition and Section 5.1(*l*) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed.

(d) **Required Consents Received.** The Seller shall have obtained and delivered to the Purchaser copies of all Required Consents listed on or required to be listed on **Schedule 2.2.** and no such Required Consents shall have been withdrawn, suspended or conditioned.

(e)    **Instrument of Transfer.** The Seller shall have executed and delivered to the Purchaser a Bill of Sale, in a form reasonably acceptable to the Purchaser (the "**Bill of Sale**"), reflecting the Seller's transfer of the Purchased Assets to the Purchaser free and clear of all Liens.

(f)    **Certificates of Title.** The Seller shall have delivered to the Purchaser all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets, duly endorsed and in a form suitable for transfer to Purchaser.

(g)    **No Injunction.** The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

(h)    **License.** The Purchaser shall have received a license for the Facility executed by the owner thereof in form and substance satisfactory to Purchaser (the "**License**").

(i)    **Bank Account.** Ownership of the Bank Account shall have been transferred to Purchaser free and clear of all Liens pursuant to documentation in form and substance satisfactory to Purchaser.

(j)    **TSA** The Purchaser shall have received the TSA executed by the Seller and Seller shall employ the General Employees and Production Employees as defined in and required by the TSA.

(k)    **Bidding Procedures Order; Sale Approval Order.** The Bidding Procedures

Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Purchaser. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Bankruptcy Court, which Sale Approval Order shall not have been (x) stayed, vacated or reversed (in whole or in part); or (y) amended or modified in any material respect other than with the consent of the Purchaser.

(l)     **Inventory and Accounts Receivable.** The Seller shall have delivered to Purchaser at least one day prior to the Closing Date, an AR Invoices Only report (in a form satisfactory to Purchaser) and an Inventory Listing by Item Report (in a form satisfactory to Purchaser), and a closing certificate (in form and substance satisfactory to Purchaser).

(m)    **Documents.** The Purchaser shall have received such other certificates, documents and materials as it shall reasonably request.

(n)    **Assumption Procedures.** The Bankruptcy Court shall have approved the Assumption Procedures.

5.2 **Conditions to Obligations of Seller.** Unless waived in writing by the Seller, at or prior to the Closing, the obligation of the Seller hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

(a)    **Payment of Purchase Price.** At the Closing, the Purchaser will pay (or cause to be paid) the Purchase Price in accordance with Section 1.6 by wire transfer of immediately available funds pursuant to the wire instructions provided by Seller.

(b)    **No Injunction.** The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

(c)    **Representations and Warranties True.** The representations and warranties of the Purchaser contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

(d)    **Covenants Performed.** The Purchasers shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

(e)    **Bidding Procedures Order; Sale Approval Order.** The Bidding Procedures Order shall not have been (i) stayed, vacated or reversed or (ii) amended or modified in any material respect other than with the consent of the Purchaser. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Seller.

OMM US:76285949.7

## ARTICLE 6
## SURVIVAL; INDEMNIFICATION

6.1    **Survival.** The representations, warranties, covenants and agreements contained herein shall survive until the applicable statute of limitations has expired. No action for a breach of the representations, warranties and covenants contained herein shall be brought more than 12 months following the Closing Date, except for claims (i) relating to Fundamental Representations and claims relating to the covenants set forth in Section 4.1 hereof which shall survive indefinitely, and (ii) of which the Seller has been notified with reasonable specificity by the Purchaser, or claims of which the Purchaser has been notified with reasonable specificity by the Seller, within the applicable period, shall survive until such claims have been resolved.

6.2    **Indemnification by the Seller.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Seller, on behalf of NECCO and the Estate, shall indemnify and hold the Purchaser and its Affiliates harmless from and against all claims, Liabilities, obligations, costs, damages, losses and expenses (including attorneys' fees and costs of investigation but excluding consequential or punitive damages) of any nature (collectively, "Losses") arising out of or relating to (i) any breach or violation of the representations or warranties of the Seller set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Seller set forth in this Agreement, (iii) the Excluded Liabilities, (iv) any other obligations or Liabilities of Seller as may be detailed in the TSA or a breach by Seller of the TSA, (v) the Bankruptcy Case, (vi) any Liens that attach to or are asserted against the Purchased Assets after the Closing due to any action or inaction by the Seller prior to the Closing, (vii) any Purchase Price Reduction that is not deducted from the Purchase Price by Purchaser at Closing, or (viii) any violation of any bulk sales laws as a result of the consummation of the Transactions, to the extent applicable.

6.3    **Indemnification by the Purchaser.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Purchaser shall indemnify and hold the Seller, on behalf of NECCO and/or the Estate, harmless from and against all Losses arising out of or relating to (i) any breach or violation of the representations or warranties of the Purchaser set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Purchaser set forth in this Agreement, or (iii) any other obligations or Liabilities of Purchaser as may be detailed in the TSA or a breach by Purchaser of the TSA.

6.4    **Right of Set-Off.** If the Seller, on behalf of NECCO and/or the Estate, has not satisfied in cash any indemnification obligation owed by it hereunder after notice of any such obligation, the Purchaser or any of its Affiliates may, at their discretion, satisfy the unpaid portion of such obligation by, to the extent permitted by law, setting-off against any amounts that may be due and owing from the Purchaser or any of its Affiliates to the Seller, NECCO and/or the Estate or any of their respective Affiliates. Unless otherwise set-off as provided for in this Section 6.4, all indemnity payments shall be made within seven (7) days of request by the party demanding indemnification.

6.5    **Adjustment to Purchase Price.** All indemnification payments paid pursuant to this Article shall be adjustments to the Purchase Price.

## ARTICLE 7
## TERMINATION

7.1    **Termination.** This Agreement and the Transactions contemplated hereby may be

OMM US:76285949.7

terminated:

      (a)    by mutual written consent of the Purchaser and the Seller;

      (b)    by the Seller, if the Purchaser shall have breached or failed to perform in any of its other obligations, covenants or agreements under this Agreement or if any of the representations and warranties of the Purchaser set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Seller's reasonable satisfaction within three (3) days after the Purchaser is provided notice of such breach, failure or misrepresentation;

      (c)    by the Purchaser, if the Seller shall have breached any of its obligations, covenants, or agreements under this Agreement or if any of the representations and warranties of the Seller set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Purchaser's reasonable satisfaction within three (3) days after Seller is provided notice of such breach, failure or misrepresentation;

      (d)    by the Purchaser, if (i) the Sale Approval Order is not entered by the Bankruptcy Court on or before May 29, 2018, or (ii) the Sale Approval Order has been entered by the Bankruptcy Court on or before May 29, 2018 but the Closing Date shall not have occurred within one business day of entry of the Sale Approval Order or, in each case, such other date, if any, as the Purchaser and Seller may agree in writing; and

      (e)    automatically, if Seller accepts a bid relating to a definitive written agreement involving a sale, pursuant to the Bidding Procedures Order, of any of the Purchased Assets to a purchaser or purchasers other than Purchaser (an "**Alternative Transaction**");

except that this Agreement may not be terminated under this section by or on behalf of any party that is in breach of any representation or warranty or in violation of any covenant or agreement contained herein.

    7.2    **Effect of Termination.**

      (a)    If this Agreement is terminated under Section 7.1(a) herein, all obligations of the Seller to the Purchaser and of the Purchaser to the Seller will terminate without further liability of any party hereto.

      (b)    If this Agreement is terminated under Section 7.1(b) herein or if the Sale Approval Order has been entered by the Bankruptcy Court on or before May 23, 2018 and all of the conditions precedent to the Purchaser's obligation set forth in Section 5.1 have been met and Purchaser fails to pay the Purchase Price in accordance with Section 1.6, nothing shall be deemed to restrict the remedies available against Purchaser by the Seller.

      (c)    If this Agreement is terminated under Section 7.1(c) or (d) herein, nothing shall be deemed to restrict the remedies available against Seller by the Purchaser.

      (d)    If this Agreement is terminated under clause (a), (b), (c), (d) or (e) of Section 7.1 herein, Seller shall return the Deposit Amount to Purchaser within five (5) business days of termination, unless the Bankruptcy Court determines, by separate Order of the Bankruptcy Court on motion of Seller

OMM US:76285949.7

filed within such five-business-day period of time, that the Deposit Amount shall be forfeited in accordance with paragraph 2(g) of the Bidding Procedures Order.

## ARTICLE 8
## MISCELLANEOUS

8.1    **Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

(a) if to the Seller:

New England Confectionary Company, Inc.
135 American Legion Highway Revere, MA 02151
Attention: Michael McGee E-mail:
mmcgee@necco.com

with a copy to:

Harold B. Murphy, Chapter 11 Trustee
Murphy & King, P.C.
One Beacon Street
Boston, MA 02108
bmurphy@murphyking.com

(b)    if to the Purchaser, to:

Round Hill Investments LLC 200 Greenwich Avenue
Greenwich, CT 06830 Attention: Michael Cramer
Email: mjcramer61@gmail.com

with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP Times Square Tower 7
Times Square New York, NY 10036 Attn: Tobias L.
Knapp Email: tknapp@omm.com

or at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed or otherwise actually delivered, or on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service.

8.2    **Governing Law; Forum.** This Agreement shall be governed by and construed in accordance with the internal laws of The Commonwealth of Massachusetts applicable to agreements executed and to be performed solely within such State. Any judicial proceeding arising out of or relating to this Agreement shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of such court, and irrevocably agrees

23

to be bound by any judgment rendered thereby in connection with this Agreement.

**8.3    Amendments, Waivers.** This Agreement may be amended or modified only with the written consent of the Purchaser and the Seller. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights provided hereunder are cumulative and not exclusive of any rights, powers or remedies provided by law.

**8.4    Expenses.** Except as otherwise expressly set forth herein, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**8.5    Successors and Assigns.** This Agreement, and all provisions hereof, shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, provided that this Agreement may not be assigned by any party without the prior written consent of the other parties hereto except that (a) the rights hereunder of the Purchaser may be assigned to any assignee or nominee (and the Purchaser may designate different assignees and/or nominees for various rights), so long as the Purchaser remains obligated for the performance of its obligations hereunder and (b) this Agreement may be assigned by the Purchaser to any of its equity holders or Affiliates or to any Person acquiring a portion of the Purchased Assets, or the business or securities of the Purchaser, whether by merger, consolidation, sale of assets or securities or otherwise so long as such assignee assumes all obligations for the performance of the Purchaser's obligations hereunder.

**8.6    Entire Agreement.** This Agreement, the attached exhibits and schedules, and the other agreements, documents and instruments contemplated hereby contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless expressly referred to herein.

**8.7    Counterparts.** This Agreement may be executed in one or more counterparts, and with counterpart facsimile signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Agreement.

**8.8    Headings.** The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

**8.9    Further Assurances.** Following the Closing, the parties will execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Purchaser or the Seller in order to fully consummate the Transactions in accordance with this Agreement.

**8.10    Third Party Beneficiaries.** Nothing in the Agreement shall be construed to confer any right, benefit or remedy upon any Person that is not a party hereto or a permitted assignee or nominee of a party hereto, except as otherwise expressly set forth in this Agreement.

**8.11    No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other

OMM US:76285949.7

agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

8.12    **Publicity.** Purchaser and Seller shall have the right to disclose the Transactions contemplated hereby (other than the Purchase Price) in marketing materials, press releases and other announcements following the Closing; provided neither Seller nor Purchaser shall use or disclose the names of Ares Capital Corporation, the investment advisor thereof, American Capital, Ltd., or AC AS, LLC (and each of the foregoing third parties are expressed third party beneficiaries hereto entitled to enforce the provisions of this Section 8.12 as if direct parties hereto); provided further that Purchaser shall have the right to review and approve any such public release by the Seller.

8.13    **Schedules and Exhibits.** All schedules and exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference in this Agreement for all purposes of this Agreement. All schedules and exhibits delivered with this Agreement shall be arranged to correspond with the numbered and lettered sections and subsections contained in this Agreement, and the disclosures in such schedules shall qualify only the corresponding sections and subsections contained in this Agreement, unless otherwise expressly provided herein.

8.14    **Severability.** This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

8.15    **Certain Taxes.** All transfer, documentary, sales, use other such Taxes and fees incurred in connection with this Agreement shall be paid by the Seller when due, and the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use and other Taxes and fees.

[Signature page follows.]

OMM US:76285949.7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as a sealed instrument as or the date first above written.

SELLER:

HAROLD B. MURPHY, IN HIS CAPACITY
AS CHAPTER 11 TRUSTEE OF NEW
ENGLAND CONFECTIONERY COMPANY,
INC.

By: _____
    Name: Harold B. Murphy

PURCHASER:

ROUND HILL INVESTMENTS LLC

By: _____
    Name:
    Title:

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as a sealed instrument as or the date first above written.

SELLER:

HAROLD B. MURPHY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NEW ENGLAND CONFECTIONERY COMPANY, INC.

By: _____
Name: Harold B. Murphy, Ch. 11 Trustee

PURCHASER:

ROUND HILL INVESTMENTS LLC

By: _____
Name:
Title:

[Signature Page to Asset Purchase Agreement]

## SCHEDULES

The Schedules will be finalized as of the Closing Date, and shall be available upon request.

EXHIBIT C

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this "**Agreement**") is made and entered into as of May 25, 2018 by and between Harold B. Murphy, in his capacity as the duly appointed chapter 11 trustee (the "**Trustee**" or the "**Seller**") for the bankruptcy estate (the "**Estate**") of New England Confectionery Company, Inc., a Delaware corporation ("**NECCO**"), the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**") and Round Hill Investments LLC, a Delaware limited liability company (the "**Buyer**"). The Buyer and the Seller are hereinafter referred to jointly as the "**Parties**", and each individually as a "**Party**".

### Introduction

The Seller and the Buyer entered into an Asset Purchase Agreement dated as of May 18, 2018 (the "**Purchase Agreement**"; capitalized terms used herein but not defined shall have the meanings ascribed to them in the Purchase Agreement), pursuant to which the Buyer has agreed to purchase from the Seller the Purchased Assets, upon and subject to the terms and conditions set forth in the Purchase Agreement. As contemplated by Section 5.1(i) of the Purchase Agreement, the Buyer has determined that it would like the Seller to provide transition services, and the Seller and the Buyer are entering into this Agreement simultaneously with the Closing to set forth the terms upon which the Seller will provide such services.

Now, therefore, in consideration of the agreements and promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### SERVICES

**Section 1.1    Provision of Services.** Subject to the terms and conditions of this Agreement (a) to the extent requested by the Buyer in the exercise of its sole discretion, the Seller agrees to provide those employees of the Seller necessary to assist in the production of inventory produced during the Transition Period ("**New Inventory**") as reasonably requested by the Buyer within 3 to 5 days of the Closing Date (the "**Production Employees**"), (b) the Seller agrees to provide the employees set forth on Schedule 1.1(b) hereto for the period of time set forth on such Schedule 1.1(b) (the "**General Employees**"), and (c) the Seller agrees, within 10 days after the Buyer gives written notice to the Seller to commence the process, to empty, clean and make ready for sale the tangible assets that are part of the Purchased Assets and that are used to produce New Inventory (collectively, the "**Services**"). Seller will not terminate any Production Employees or General Employees during the Transition Period other than for cause as part of Seller's employment policies and past practices unless otherwise requested by Buyer, provided that Seller shall provide written notice to Buyer at least 2 days prior to any termination by Seller, unless a shorter period is warranted under the circumstances, and Seller shall provide replacement employees with the same skill set and experience as any terminated employees, unless Buyer notifies Seller otherwise.

OMM_US:76289173.5

**Section 1.2    Manner of Service.** The Seller will cause the Production Employees and the General Employees to perform their work with the degree of care, skill and supervision consistent with past practice and in compliance with applicable laws, rules and regulations. During the Transition Period, the Seller will (i) handle personnel matters the same as the Seller has in the past, and (ii) not implement any change to the existing employment policies of the Seller.

## ARTICLE II
## TERM

**Section 2.1    Transition Period.** As used herein, the term "**Transition Period**" shall mean the period commencing on the date hereof and ending on November 30, 2018.

**Section 2.2    Reimbursement of Expenses during Extended Transition Period.** During the period commencing on May 31, 2018 and ending on the earliest of (a) last day the Buyer requires Production Employees, (b) November 30, 2018 and (c) the date upon which Buyer terminates this Agreement pursuant to the terms hereof (the "**Extended Transition Period**"), the Buyer agrees to reimburse Seller, in advance and on a weekly basis to the extent that the Seller and Buyer have agreed in advance to the amounts to be advanced for such week, for the wages, commissions and written employment benefits in effect on the date hereof (including, written employee benefit plans in effect on the date hereof but excluding retiree benefit plans or programs or severance payments) for the Production Employees requested by the Buyer (in its sole discretion), as well worker's compensation insurance, employment taxes, and other scheduled employer liabilities relating to such Production Employees as required by law to be provided by the Seller during the Extended Transition Period. In the event Buyer and Seller do not agree to the amount of reimbursement as provided above, Seller shall not be obligated to pay for any such costs and expenses and shall not be obligated to continue its performance hereunder, and Seller's non-performance shall not be deemed a breach hereunder.

## ARTICLE III
## COMPENSATION

**Section 3.1    Compensation for Services.** The Seller will provide the Services at no cost or expense to Buyer whatsoever, other than as provided in <u>Section 2.2</u> above.

**Section 3.2    Reserved.**

**Section 3.3    Reserved.**

## ARTICLE IV
## PERSONNEL

**Section 4.1    Compensation; Insurance.**

(a)    The Seller shall employ, pay, supervise and direct and discharge all of the Seller's personnel providing Services hereunder. Subject to reimbursement under <u>Section 2.2</u> hereof, the Seller shall be solely responsible for the payment of all wages, bonuses, commissions, benefits (including, employee benefit plans, programs and arrangements) and any other direct and indirect compensation for its personnel assigned to

2

perform Services under this Agreement, as well as be responsible for its worker's compensation insurance, employment taxes, and other scheduled employer liabilities relating to such personnel as required by law to be provided by the Seller during the Transition Period. For the avoidance of doubt, any Production Employees shall remain employees of the Seller (and not of Buyer). The Buyer shall not be deemed to control the Seller's employees and the Buyer shall not be responsible for any expenses incurred in connection with the employment of such employees.

(b)    The Seller has procured, and during the period from the date hereof until the earlier to occur of (i) the expiration of the Transition Period or (ii) the termination of this Agreement in accordance with its terms, will maintain, policies of insurance in the amounts listed below and in such form and with such insurance providers as shall be reasonably satisfactory to the Buyer, provided that unless otherwise expressly agreed all such policies shall be on an "occurrence basis". In the event of a claim under any such policies, Seller shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder. The Buyer shall be named as an additional insured, with waiver of subrogation, under the Seller's insurance policies required under this Section 4.1(b).

(i) Statutory workers' compensation insurance, including employers' liability insurance, with a limit for each accident not less than the limits in effect on the Closing Date.

(ii) Comprehensive general liability insurance with limits of not less than the limits in effect on the Closing Date for each occurrence and in the aggregate. Combined single limit for bodily injury and property damage liability, including personal injury, contractual liability and products/completed operations.

## ARTICLE V
## TERMINATION

**Section 5.1    Termination by Either Party.** This Agreement, or any Service provided hereunder, may be terminated by (i) mutual written agreement of the Parties, (ii) by the Buyer upon seven (7) days' prior written notice to the Seller, or (iii) by either Party upon written notice to the other Party if the other Party fails to perform or otherwise breaches an obligation under this Agreement; provided, however, that such Party failing to perform or otherwise breaching shall have three (3) days from the date notice of intention to terminate is received to cure the failure to perform or breach of an obligation, at which time this Agreement or the applicable Service, as the case may be, shall terminate if the failure or breach has not been cured to the reasonable satisfaction of the other Party.

**Section 5.2    Termination Notices.** Any termination notice delivered by either Party shall specify in detail (i) the Service or Services to be terminated, or (ii) if this Agreement is to be terminated as a whole, and, in each case, the effective date of termination.

3

## ARTICLE VI
## MISCELLANEOUS

**Section 6.1    Assignment.** This Agreement may not be assigned by the Seller in whole or in part without the prior written consent of the Buyer. The Buyer shall have the right to assign this Agreement to assignees or nominees of the Buyer. Any assignment, delegation or transfer of this Agreement or any interest herein in violation of the terms of this Agreement is void and cause for termination of this Agreement.

**Section 6.2    Entire Agreement; No Third Party Beneficiaries.** This Agreement and the Exhibit and Schedule attached hereto, together with the provisions of the Purchase Agreement (including defined terms) incorporated herein (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and (b) are not intended to confer upon any Person other than the Parties any rights or remedies hereunder.

**Section 6.3    Relationship of the Parties.** Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each Party being individually responsible only for its obligations as set forth in this Agreement. None of the employees of the Seller performing services in connection therewith shall be deemed employees of the Buyer.

**Section 6.4    GOVERNING LAW; SUBMISSION TO JURISDICTION AND SELECTION OF FORUM; WAIVER OF JURY TRIAL.**

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF.

(b)    EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN THE BANKRUPTCY COURT (AS DEFINED IN THE PURCHASE AGREEMENT).

**Section 6.5    Notices.** All notices, requests, demands and other communications required by or made under this Agreement must be in writing and shall be deemed given when delivered in accordance with the provisions for delivery of notice contained in the Purchase Agreement.

**Section 6.6    Headings.** Headings of the Articles and Sections of this Agreement are for convenience of the Parties only, and shall be given no substantive or interpretative effect whatsoever.

**Section 6.7    Survival of Provisions.** The representations, warranties and covenants contained herein shall survive the termination or expiration of this Agreement to the full extent necessary to protect the Party in whose favor they run.

4

OMM_US:76289173.5

**Section 6.8    Waivers.**  Except as otherwise expressly provided in this Agreement, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party or Parties entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**Section 6.9    Amendment and Modification.**  This Agreement may only be amended, modified and supplemented by written agreement of the Parties.

**Section 6.10    Counterparts.**  This Agreement may be executed in multiple counterparts, including facsimile counterparts, all of which shall together be considered one and the same agreement.

**Section 6.11    Severability.**  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

[Signature page follows]

5

OMM_US:76289173.5

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

HAROLD B. MURPHY, IN HIS CAPACITY AS
CHAPTER 11 TRUSTEE OF NEW ENGLAND
CONFECTIONERY COMPANY, INC.

By: _____
Name: Harold Murphy
Title: Ch. 11 Trustee

ROUND HILL INVESTMENTS LLC

By: _____
Name: _____
Title: _____

[Signature Page to Transition Services Agreement]